## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                  )
BARBARA ANN ROBERTS                               )
1919 Terrace Road, SE                             )
Washington, DC 20032                              )
                                                  )
              Plaintiff,                          )
                                                  )
         v.                                       )  Civil Action No. _____
MICHAEL B. MUKASEY, Attorney General,             )
U.S. Department of Justice                        )
950 Pennsylvania Ave., NW                         )
Washington, DC 20530                              )
         and                                      )
DONNA CARR, (Acting)  Chief Clerk                 )
Office of the Chief Clerk, EOIR                   )
Board of Immigration Appeals,                     )
U.S. Department of Justice                        )
5107 Leesburg Pike, Suite 2500                    )
Falls Church, VA 22041                            )
                                                  )
              Defendants.                         )
_____)

## **COMPLAINT**

Plaintiff, Barbara Ann Roberts, by and through her undersigned counsel, respectfully

submits this complaint against Defendant Michael B. Mukasey, in his capacity as Attorney

General of the United States Department of Justice, and Ms. Donna Carr, in her capacity as the

Chief Clerk (Acting) of the Office of the Executive Office of Immigration Review, the Agency

where Plaintiff is employed, for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e, et seq., including unlawful discrimination based upon race and color, and reprisal for

filing a complaint with the Equal Employment Opportunity Commission against her federal government employer, the United States Department of Justice, Executive Office of Immigration Review, Board of Immigration Appeals.

## I.  THE PARTIES

1.  Plaintiff is Barbara Ann Roberts, an African-American woman.  She is currently a resident of Washington, D.C.  From January 2001, to present, Ms. Roberts is employed as a legal assistant by the United States Department of Justice, Executive Office of Immigration Review, Board of Immigration Appeals in Falls Church, Virginia.

2.  Defendant Michael B. Mukasey is Attorney General of the United States and therefore the chief executive officer of the Department of Justice, which agency has its headquarters in the District of Columbia, and Defendant Donna Carr is the Chief Clerk (Acting), of the Executive Office of Immigration Review, Board of Immigration Review, the agency within the Department of Justice which employs the Plaintiff.  Defendants are employers, as defined by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, They are sued in their official capacity.

## II.  JURISDICTION AND VENUE

3.  This Court has subject matter jurisdiction over these claims, pursuant to 28 U.S.C.  § 1131 (federal question) and 1343 (civil rights), because Plaintiff's claim arises under federal law -, 42 U.S.C. § 2000e, *et seq.*

4.  Specifically, this Court has jurisdiction over this Complaint pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § § 2000e-5, 2000e-16, and 1981a.

5.  Venue is proper within the District of Columbia, pursuant to 28 U.S.C. § 1391 because

Defendant Agency, the United States Department of Justice, has its headquarters in the District of Columbia, located at 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001.

### III.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.    The Plaintiff timely initiated contact with Defendant's Equal Employment Opportunity ("EEO") Office regarding her initial claim of race/color discrimination and her subsequent claim of reprisal discrimination - within 45 days of the incidents that gave rise to her formal complaint.  Plaintiff then filed a formal complaint of race/color discrimination with the Department of Justice (DOJ), Justice Management Division, Equal Employment Opportunity Staff, on August 19, 2004 and amended her complaint to include reprisal discrimination on November 30, 2005, under Agency Docket Number B-04-2507.  After the Agency completed its Report of Investigation ("ROI") on Plaintiff's formal complaint, Defendant waived her right to an Equal Employment Opportunity ("EEO") hearing.  The Agency issued its Final Agency Decision on February 12, 2008.  No Appeals to the Commission have been filed.  Therefore Plaintiff has exhausted her administrative remedies on these issues.  *See* 42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.407(a).

### IV.  FACTS GIVING RISE TO THIS COMPLAINT

THE PLAINTIFF AND RESPONSIBLE MANAGEMENT OFFICIALS:

7.    The Plaintiff, Barbara Ann Roberts, is an African-American female.  She has been an employee of the U.S. Department of Justice, Executive Office of Immigration Review,

Board of Immigration Appeals (hereinafter "BIA" or "Agency") since August 30, 1998. From approximately June of 2000 to the present, she has been employed in the BIA, Office of the Chief Clerk located in Falls Church, Virginia (GS-0986-06/07).

8.   Ms. Karen M, Vowell is a Caucasian female.  At all times relevant to this Complaint, she was a Supervisory Program Specialist, GS-12, head of the Western Team Office, Clerk's Office, BIA, EIOR, DOJ.  She served as Plaintiff's first-line supervisor from Feb 24, 2002, until on or about February 23, 2004.  She is accused of subjecting Plaintiff to race discrimination, race-based harassment and  hostile workplace discrimination from approximately October of 2002 to February 10, 2004, and reprisal based harassment and hostile workplace discrimination from February 10, 2004 to the present.  From February 24, 2002, until on or about February 23, 2004, Ms. Vowell supervised a team of nine full-time employee's, including eight African American and one Caucasian employees in the Western Team Office.

9.   Glenda Evans is a Caucasian female.  At all times relevant to this Complaint, she was a Supervisory Case Management Specialist, GS-11, Streamline section, Clerk's Office, BIA, EIOR, DOJ.  She was Plaintiff's first-line supervisor in the Streamline section from on or about March of 2004 to December of 2004.  She is accused of assisting Ms. Vowell to discriminate against Plaintiff and of continuing a campaign of discriminatory conduct against Plaintiff because of Plaintiff's race and in reprisal for Plaintiff's prior EEO activity.  Ms. Evans discriminatory conduct occurred from November of 2004 to December of 2004.

10.    W. Wayne Stogner is a Caucasian male.  At all times relevant to this Complaint, he

served as a Senior Panel Attorney, GS-15, Panel 3, BIA, EIOR, DOJ.  He supervised all

other BIA immigration attorneys in that office and he also supervised Glenda Evans.

Accordingly he was Plaintiff's second-line supervisor in the Streamline department BIA,

EIOR, DOJ, from February 23, 2004 to December 27, 2004.  Because he was duped into

relying on false remarks made by Ms. Karen Vowell, he is not accused of discriminatory

action himself, but of unknowingly allowing his subordinates from engaging in

discriminatory conduct.

11.    Dorrence D. Andrews (aka "Dee" Andrews) is an African-American woman.  At all

times relevant to this Complaint, she was team leader of the Priority Case Management

Team ("PCM"), GS-12 or 13 in the Clerks Office.  Dorrence D. Andrews was Plaintiff's

first-line supervisor from February 2005, until October of 2005.  Ms. Andrews is accused

of race and reprisal discrimination from February 2005 until the present.  She is now

Deputy Chief  of the Clerk's Office (second in command), GS-14.

12.    Steve Gunderson is a Caucasian male.  At all times relevant to this Complaint, he served

as Deputy Chief Clerk for Administration, Clerk's Office, GS-14, BIA, EIOR, DOJ.  He

served as Plaintiff's second-line supervisor from 2002, until June 2005.  He is accused of

race and reprisal based harassment and  hostile workplace discrimination from October

2002, until June 2005.

13.    Frank Krider is a Caucasian male.  From January 5, 2004, until sometime in late 2006, or

early 2007, he served as Acting Chief Clerk  and then became Chief Clerk, GS-15, Office

of the Chief Clerk, BIA, EIOR, DOJ.  As such, he was the highest-level manager in

Office of the Chief Clerk until he was replaced by Donna Carr.  He is accused of

participating in and condoning race discrimination, race-based, harassment and hostile

workplace discrimination and reprisal-based, harassment and hostile workplace

discrimination perpetrated by others against Plaintiff.

14.    Donna Carr is a Caucasian

## DISCRIMINATION BASED ON RACE:

15.    From Feb 24, 2002, to February 23, 2004, Plaintiff Barbara Ann Roberts was employed

as a legal assistant, GS-7, step 5, assigned to the BIA, Office of the Chief Clerk, Western

Team, under the supervision of Ms. Karen Vowell.

16.    On information and belief, in 2002, and thereafter, although the employee work force in

the Clerk's office included a large percentage of black and other minority employees in

pay grade levels GS-7 and below, there were almost no black or minority supervisors or

managers in grade levels GS-11 and above.

17.    In 2002, the Clerk's Office was understaffed and Ms. Roberts was performing the duties

of three separate positions on the Western Team- she was the supervisor of the

transcription team, the brief setter for the Western and Eastern teams, and she also did the

office payroll.  Three separate employees normally performed these jobs.

18.    From sometime in June of 2002, to February 23, 2004, Ms. Roberts was subjected to

ongoing race discrimination and race based, harassment and hostile workplace

discrimination by her white supervisor, Ms. Karen Vowell and other white supervisors.

Ms. Roberts was regularly blamed for doing things wrong that she did not do, and others

automatically assumed she was guilty of said wrongdoing until she proved she was not.

-6-

Even when she was later found not to be at fault, her supervisors never acknowledged that she had been wrongly accused and she was erroneously assigned blame for said wrongs in her performance appraisals.  For example:

19.    In June of 2002, a contractor named Vasselina Bailey was upset that Plaintiff was appointed supervisor of the transcription unit over her.  Ms. Bailey confronted Plaintiff, tried to provoke a fight, and a loud argument ensued.  Plaintiff reported the confrontation to her supervisor, Karen Vowell, who chose to punish only the Plaintiff for the altercation.

20.    On information and belief, Vasselina Bailey, was not punished for her part in the altercation; she was allowed to continue as a private contractor working with the Clerk's Office; and was later interviewed for an employee position within the Clerk's Office.

21.    In October of 2002, Marcia Cato, Karen Vowell and Steve Gunderson erroneously blamed Ms. Roberts for problems with invoices used for paying transcribers.

22.    This incident caused Ms. Roberts to have a nervous breakdown and she had to take almost three months medical leave (this leave should have been worker's compensation leave pay because the breakdown was due to work-related stress) to recover.

23.    Soon after the incident it was discovered that Marcia Cato had failed to process these invoices for almost nineteen months and, to conceal her mistake, Ms. Cato turned these invoices in to the finance department after Ms. Roberts had become supervisor of the transcription unit, so that it would look like Ms. Roberts had failed to timely process those invoices.

24.    Karen Vowell and Steve Gunderson later discovered Ms. Cato's ruse, yet they did not

report the ruse to the then Chief of the Clerk's Office, Jeff Fratter,  instead they continued

to allow management to think it was Ms. Roberts' fault; and Ms. Roberts was later

blamed for the incident by Karen Vowell in Ms. Robert's  2002-2003, annual

performance evaluation.

25.     On December 15, 2002, Ms. Vowell cussed at Ms. Roberts in Deputy Chief Gunderson's

office.  Ms. Vowell was upset with Ms. Roberts because Ms. Roberts has been on

medical leave for two months and, because of her absence, the Western team was no

longer the top producing team in the Clerk's Office.  Ms. Vowell also said that Ms.

Roberts had been "selfish" for being out sick .

26.     On April 7, 2003, Ms. Roberts and another BIA employee, Ms. Natalie Myers (a

Caucasian female) entered the Clerk's office at the same time, both were late a few

minutes late reporting for work.  Ms. Vowell confronted Ms. Roberts but not Ms. Myers.

Ms. Vowell said, " I want your damn leave slips right now because I'm sick and tired of

your bullshit, and Barbara, I've got your damned number, okay."

27.     Natalie Myers was not required to turn in a leave slip because she was white.

28.     In February of 2003, Ms. Roberts broke the Clerk's office record by producing briefing

schedules - she personally produced 1,500 briefing schedules in one month, which was

one-half of the entire western team's monthly production of briefing schedules.  This was

in addition to other regular duties of her position as a legal assistant.

29.     In March of 2003, Ms. Roberts broke her own record by producing 2,500 briefing

schedules in one month.

30.     Based upon her exemplary performance, a new briefing schedule standard was

implemented, requiring a higher rate of brief production for all teams in the Clerk's Office.

31.  Some other Clerk's Office employees resented the change and harbored ill feelings towards Ms. Roberts because of the change.

32.  On July 9, 2003, Ms. Roberts received "spot awards" in recognition of her aforesaid job performance in February and March.  She received a $200 spot award for February, a $200 spot award for March, and another spot award of 12 days off with pay.

33.  In total, Ms. Roberts received eight or nine spot awards in 2003.  She also received a thank you letter from an Oregon State senator, which was received through her supervisor Karen Vowell.  She also received a personal visit from an Alien appellant who thanked her for counseling and calming him by phone for several years while pursuing an appeal to the BIA.  This Alien also reported Ms. Roberts' remarkable assistance to her supervisor, Karen Vowell and also to Chief Clerk, Frank Krider.

34.  Despite her exemplary performance during the performance appraisal period of April 1, 2002 to March 31, 2003, Ms. Roberts did not receive a QSI award for that appraisal year. Curiously, another employee, Ms. Mildred Byers, a personal friend of Karen Vowell who did not set any office records and who had been much less productive than Ms. Roberts, did received a QSI award from Karen Vowell for that same year.

35.  On December 30, 2003, Ms. Roberts discovered that Ms. Byers had received a QSI award and she had not.  Ms. Roberts then met with Karen Vowell to discuss her 2002/2003 performance evaluation.  During that meeting, Ms. Vowell told Ms. Roberts that she did not give Ms. Roberts a QSI award because Ms. Roberts had had an argument

with Ms. Byers in June, 2002.

36.   What happened in June of 2002 was that Ms. Byers attempted to interrupt a conversation
      Ms. Roberts was having with another Clerk's Office employee, Shanna Jackson.  That
      conversation was important as it concerned a briefing schedule that had to be
      immediately reset.  For this perceived slight, Ms. Byers yelled at Ms. Roberts, Ms.
      Roberts responded without apology and an argument ensued.

37.   On information and belief, Ms. Byers was never sanctioned for her part in that argument.

38.   On January 5, 2004, after a Western Team meeting, Ms. Vowell asked the team if they
      had any questions.  When Ms. Roberts raised her hand, Ms. Vowell responded "everyone
      is tired of hearing your shit, especially management, take your evaluation and go look for
      another job."  Ms. Roberts was humiliated in front of the entire Western team and she left
      the meeting in upset.

39.   On January 5, 2004, after the meeting, Ms. Roberts returned to her work. She completed
      54 briefing schedules that day, which was reflected in the computer records.  According
      to standard operating procedures, she was only required to complete 40 briefing
      schedules each day.

40.   On January 6, 2004 at 7:35 AM, Ms. Vowell approached Ms. Roberts and accused her of
      not doing any work the day before.  Ms. Roberts pointed to a stack of 54 records of
      proceedings on an adjacent desk, which records reflect that Ms. Roberts had in fact
      completed 54 briefing schedules the day before.  Ms. Vowell would not count them.
      Instead, Ms, Vowell said: "Barbara, I want your damn ass to be working on briefing
      schedules this damn morning because yesterday you didn't do a damned thing all day."

Every one in the office witnessed Ms. Vowell's unreasonable and hostile behavior and Ms. Roberts' humiliation.

41.    On or about February 6, 2004, Ms. Roberts noticed an important file was missing from her desk.  She checked the file scan number (a bar code is used to track documents) on her computer and found out the file was "scanned" to the possession of another legal assistant, Ms. Mildred Byers, a lighter-skinned African American female, GS-6.

42.    Ms. Roberts was reluctant to approach Ms. Byers because there was animus between them and she did not want to get into an argument with Ms. Byers.  Instead Ms. Roberts went to her supervisor, Ms. Vowell and asked her if she could retrieve the file from Ms. Byers.  Ms. Vowell refused and sent Ms. Roberts to retrieve the file from Ms. Byers personally.

43.    Shortly thereafter,  Ms. Byers passed Ms. Roberts workstation and Ms. Roberts asked Ms. Byers about the file.  Ms. Byers went to her desk to check on the file and when she returned to Ms. Roberts desk, she began to scream at Ms. Roberts, saying she could not have the file because she had been absent when the file was removed and, "don't' ever blame her again."  Ms. Roberts first-line supervisor, Ms. Vowell, then came into Ms. Roberts work area and, without investigation or justification, immediately sided with Ms. Byers and also began yelling at Ms. Roberts saying "Barbara how do you know I didn't take the damned file off of your desk."  In response, Ms. Roberts remained composed and after an initial response she remained silent.

44.    This exchange was witnessed by other Western team employees, including Bernadine Hodges, Beverly Shears and LaKisha Winston.

-11-

45.    At some point during this incident, the Chief of the Clerks Office, Mr. Frank Krider, a
       white male, passed through the Western Team work area and witnessed both Ms. Byer's
       and Ms. Vowell standing over and yelling at Ms. Roberts.

46.    On or about February 10, 2004, at approximately 7:45 AM, Ms. Roberts was sitting at
       her desk and exchanging a greeting with a co-worker, Beverly Shears, who sat at an
       adjacent desk.  Ms. Vowell interrupted their conversation to verbally assault Ms. Roberts.
       Ms. Vowell stood very close to Ms. Roberts, with her fist balled up and her chest poked
       out, and she started yelling in Ms. Roberts face with such force that her saliva sprayed on
       Ms Roberts' face.  Based upon Ms. Vowell's physical and verbal conduct, Ms. Roberts
       feared that Ms Vowell might attack her physically.  Ms. Vowell's yelled : "Didn't I tell
       you not to speak to Beverly? What did I tell you? Didn't I tell you not to speak to her?"

47.    Ms. Roberts reported the incident to the Union, to the Chief of the Clerk's Office, Mr.
       Krider, and to the Ombudsmen, Ms. Wheaton by phone.  Ms. Wheaton requested Ms.
       Roberts to come to her office in downtown DC to discuss the incident.  Ms. Roberts
       emailed Mr. Kryder to relay Ms. Wheaton's request, and Mr. Krider authorized
       administrative leave so Ms. Roberts could go to Ms. Wheaton's office.

48.    Ms. Wheaton recommended that Ms. Roberts call Dr. Leo Shea, at Employees'
       Assistance Program ( EAP) to get back into therapy with Dr. Shea  to deal with the stress
       she was being subjected to in the workplace.  Ms. Roberts called Dr. Shea at EAP on her
       way back to the Western Team Office and left him a message.

49.    At about 1 or 2 p.m. the same day, upon returning to the Western Team Office, Ms.
       Roberts reported to Mr. Krider that she was returning from the Ombudsmen's office and

that she had not yet had her lunch.  Mr. Krider gave her permission to take her lunch break at that time.

50.    Ms. Roberts was sitting at her desk eating her lunch when Dr. Shea returned her call. Because of the personal nature of the call, Ms. Roberts stepped into the mail room to talk to Dr. Shea and schedule an appointment.

51.    During the call, Ms. Vowell came into the mail room and verbally assaulted Ms. Roberts again.  Ms. Vowell yelled at Ms. Roberts, saying that Ms. Roberts was not supposed to be in the mail room and lunch time was over.  Ms. Roberts calmly told Ms. Vowell that Frank Krider had given her permission to take her lunch at that time.  Ms. Vowell yelled in reply that Ms. Roberts was supposed to take her lunch between 1 and 2 p.m.  Ms. Roberts informed Ms. Vowell that she had just returned from the ombudsman's office, which is why Frank Krider has authorized her to take her lunch at that time.  Ms. Vowell then stormed out of the mail room.

52.    This verbal assault was witnessed by contractors Darlene Jones, Willie Abraham and Wanda Jones.  Dr. Shea also heard Ms. Vowell's verbal assault through the phone and expressed his concern that an employee would be treated the way he had heard Ms. Vowell treat Ms. Roberts.

53.    Dr. Shea advised Ms. Roberts to immediately report this new incident to the Ombudsman, Ms. Wheaton.  Ms. Roberts then called Ms. Wheaton to report this second incident, and then she went to Frank Krider's office to report the second incident.

54.    Subsequently, Ms. Wheaton also called Frank Krider's office and insisted that Frank Krider immediately remove Ms. Roberts from Ms. Vowell's Western Team to prevent

any  future incidents of harassment.

55.   Frank Krider immediately removed Ms. Roberts from the Western Team office and
      temporarily assigned her to another part of the same office for one week to work under
      his supervision on a backlog of BIA decisions.

56.   The next week, BIA management decided to move Ms. Roberts from her position on Ms.
      Vowell's Western Team Office to another position (on "detail assignment," not a
      permanent transfer) in the Streamline center located in another building.  There, Ms.
      Roberts would work under the supervision of Supervisory Case Management Specialist,
      Glenda Evans, a white female, and Senior Panel Attorney, W. Wayne Stogner, a white
      male.

57.   In the course of this transfer, Ms. Roberts was stripped of her authority and position as
      supervisor of the transcription unit, and was stripped of her duties and the responsibility
      of processing payroll.  Continuing in these duties, responsibilities and positions would
      have enhanced her potential for promotion and her marketability in the job market.

58.   Although Chief of the Clerk's Office, Mr. Krider, knew of the circumstances
      necessitating the transfer, when he approved the transfer, he imposed no sanction against
      Ms. Byers or Ms. Vowell regarding for their unprofessional conduct on February 6, 2004
      and/or on February 10, 2004.

59.   On information and belief, Mr. Krider subsequently approved "outstanding overall"
      evaluations for both Ms. Byers and Ms. Vowell, which evaluations did not mention either
      incident.

60.     Ms. Roberts began her new assignment, clerical duties, in the Streamline Center on or
about February  23, 2004.  On her first day in the Streamline Center, Mr. W. Wayne
Stogner told Ms. Roberts that he'd heard about her "reputation." Mr. Stogner told her that
during weekly management meetings  (called "SPA" meetings) both before and after the
incidents of February 2004, Ms. Vowell repeatedly told Mr. Stogner and other managers,
*inter alia,* that Ms. Roberts often stayed away from her desk, left work early without
permission, spoke in a "heavy" voice on the phone ( her voice is naturally deep), had
trouble getting along with co-workers and no one wanted to work with her.  Each of these
statements were entirely false.

61.     Mr. Stogner said that because of Ms. Roberts' "reputation," no one in the organization
was willing to be her supervisor.  He then said that if it weren't for Betty Christensen (a
friend and former co-worker of Ms. Roberts who was a member of his staff and whose
opinion he trusted), he never would have decided to let Ms. Roberts join his team.  He
told her that because of her reputation, she had an uphill battle to change that reputation.

62.     Despite this circumstance, Ms. Roberts enjoyed her first three months in the Streamline
center.  During that time, there were no new incidents of harassment and  hostile
workplace discrimination.  Mr. Stogner and her new supervisor, Glenda Evans, were
extremely happy with her work.

63.     Wayne Stogner proposed and Ms. Roberts agreed that the period for Ms. Roberts
2003/2004 performance appraisal should be extended from 12 to 15 months so that
Glenda Evans and Wayne Stogner could evaluate Ms. Roberts performance in her
2003/2004 performance appraisal independently and without input from Ms. Vowell.

64.    Although Ms. Roberts' new first-line and second-line supervisors, Glenda Evans and

Wayne Stogner, considered Ms. Roberts performance in the Streamline Center to be

"outstanding" in all rating categories and "outstanding overall", for some reason, despite

their agreement to the contrary, Glenda Evans, and William Stogner met with Ms.

Vowell to discuss how Ms. Roberts 2003/2004 performance appraisal should be rated.

65.    On information and belief, Ms. Vowell provided Glenda Evans and Wayne Stogner with

a list containing false and unfavorable remarks concerning Ms. Roberts' (i) attitude;(ii)

work habits; (iii) the way she interacted with co-workers; and (iv) "signs" to "look out

for."

66.    Ms. Vowell also verbally communicated to Glenda Evans and Wayne Stogner these and

other false and unfavorable remarks, e.g. Ms. Roberts often stayed away from her desk,

left work early without permission, and an unpleasant "heaviness" in her voice.  Ms.

Vowell also stated that she was having serious problems with Ms. Roberts.  Ms. Vowell

said Ms. Roberts was carrying hard feelings about her 2002/2003 performance appraisal,

she was not getting along with co-workers and she was disrupting operations.

67.    Ms. Vowell illustrated her remarks with several examples, including falsely blaming Ms.

Roberts for the altercation with Ms. Byers and the missing file incidents of February

2003.  Based upon her "assessment," Ms. Vowell recommended that Ms. Roberts should

be rated only "fully successful" instead of "outstanding" in the rating category of

"Communications/Teamwork."

68.    Glenda Evans and William Stogner accepted Ms. Vowell's recommendation at face

value, and without taking any steps top confirm the truth of Ms. Vowell's statements, Ms.

-16-

Evans relied on Ms. Vowell's statements and rated Ms. Roberts only "fully successful" instead of "outstanding" in the rating category of "Communications/Teamwork." Accordingly, she was also not rated "outstanding overall."

69. On June 28, 2004, Ms. Roberts received her 2003/2004 performance appraisal. That was when she discovered that Ms. Evans and Mr. Stogner had consulted with Ms. Vowell and had accepted Ms. Vowell's recommendation that Ms. Roberts should be given only a "fully successful" rating in the rating element of "Communications/ Teamwork."

70. Because of this downgrade in her performance appraisal ratings, Ms. Roberts became ineligible to receive a Quality Step Increase ("QSI") in her pay. She was also partially deprived an extra day off with pay that would have been awarded for "outstanding overall" job performance - Ms. Roberts received only four extra days off with pay instead of the five extra days of with pay she would have received had she been rated "outstanding overall."

71. This lower rating also compromised Ms. Roberts' chances for promotion and left her more susceptible to being among the first to be laid off should their be a reduction in force ("RIF") in the Clerk's Office or the BIA.

72. Following these revelations, Ms. Roberts considered:

a. All upper level managers at the BIA were white.

b. Of the employees who had passed through the BIA office during her tenure at the BIA, white employees were promoted and./or given favorable transfers much quicker than black employees; and

c. The complaints and concerns communicated to management by white employees were

investigated and responded to by white management, whereas the complaints of black employees usually were not.

Consequently, Ms. Roberts concluded she was being treated differently and adversely by Ms. Vowell and by other BIA managers because of her race and color.

73.    On July 20, 2004.  Ms. Roberts met with an EEO counselor to make an informal complaint of discrimination based upon her race and color.

74.    Shortly after Ms. Roberts made her informal EEO complaint, Ms. Vowell was informed of Ms. Roberts 's informal complaint.

75.    On August 12, 2004, in an attempt to resolve the informal complaint, Andrew Press and Crystal Riley, Agency Equal Employment Opportunity ("EEO") representatives, held a meeting with Ms. Roberts, Mr. Stogner and Ms. Vowell.

76.    During that meeting, Ms. Vowell acted so aggressively towards Ms. Roberts that Mr. Stogner had to warn Ms. Vowell about her behavior.  Also during this meeting, Ms. Vowell was questioned closely regarding the February 6, 2004, altercation between Ms. Roberts, Ms. Byers and Ms. Vowell and was asked why she punished only Ms. Roberts for the incident.

77.    Ms. Vowell admitted that she had blamed Ms. Roberts because her friend, Mildred Byers had come to her crying after the incident.  Ms Byers had been upset because Frank Krider had witnessed the incident and she feared the consequences that might follow.  Ms. Vowell admitted that to protect her friend, Ms. Byer, she decided to blame Ms. Roberts for the incident.

78.    When Mr. Stogner and the EEO representatives asked Ms. Vowell if she had allowed Ms.

Roberts to explain the incident before deciding to blame her for the incident, Ms. Vowell responded that she did not have to let Ms. Roberts explain.

### RACE DISCRIMINATION AND REPRISAL DISCRIMINATION CONSTITUTING HARASSMENT AND CREATING A HOSTILE WORK ENVIRONMENT:

79.    On August 19, 2004, the week after the aforesaid meeting, Ms. Robert's filed a formal complaint of discrimination based on her race and color with the Department of Justice, Justice Management Division, EEO Staff.  Ms. Roberts claimed that Ms. Vowell's false and unfavorable remarks had caused her new supervisor, Ms. Glenda Evans, to downgrade Ms. Roberts' performance appraisal in the element of "Communications/ Teamwork."  Furthermore, upper level management had failed to punish Ms. Vowell for her wrongful behavior and accepted Ms. Vowell's word that Ms. Roberts was to blame only because Ms. Vowell was white and Ms. Roberts was black.

80.    After the August 12, 2004 informal EEO dispute resolution meeting, Mr. Stogner had notice that he and Glenda Evans had relied on false information provided by Ms. Vowell in deciding to downgrade Ms. Roberts from "outstanding" to "fully successful" in the rating category of "Communications/Teamwork" in her 2003/2004 performance evaluation.

81.    Shortly thereafter there was a meeting between Ms. Roberts, Wayne Stogner, Glenda Evans, Karen Vowell.  Although all managers present acknowledged that Ms. Roberts 2003/2004 performance appraisal should be revised and corrected.  They argued about who would take responsibility for doing so.  In the end, no one accepted the responsibility and Ms. Roberts' 2003/2004 performance evaluation was never revised

and corrected.

82.   Ms. Roberts' believes that, had she been white, her performance appraisal would have
      been immediately corrected and Ms. Vowell would have been immediately punished for
      her repeated harassment of, and lies concerning, Ms. Roberts.

83.   On September 03, 2004 at 8:30 a.m.,  Ms. Roberts told Betty Christensen, Staff Assistant,
      GS-9, Screening Panel, BIA, EOIR, DOJ, that she had to go over to her old office, the
      Western Team Office, supervised by Ms. Vowell, to deliver some Joe's Pizza kits and
      cookie dough that employees in that office had ordered from her children who were
      raising money for their school.  Ms. Christensen told Ms. Roberts that the Chief Clerk,
      Frank Krider had told everyone in the Clerk's Office to watch Ms. Roberts, every move
      whenever she goes over to the Clerks Office building where the Western Team was
      located.  However, Ms. Christensen gave Ms. Roberts permission to go to the Western
      Team Office to deliver these orders.

84.   Upon her arrival in the Clerk's Office's Western Team section, Ms. Roberts went to the
      desk of Beverly Shears.  While she was there, Ms. Vowell walked up to her with a cross
      look on her face and said "may I help you" using a very hostile tone and a sarcastic
      inflection.  Ms. Roberts explained that she was there only to deliver the orders.  After Ms.
      Vowell turned away, Ms. Shears asked Ms. Roberts why Ms. Vowell had acted in such a
      hostile manner.  Ms. Shears said that Ms. Vowell did not have to be so nasty and that she
      does not act that way towards anyone else who comes into the Western Team section.

85.   Later in September, while she was off duty, Ms. Roberts went to the Western Team
      section again to seek help from a friend in responding to KSA's (Knowledge and Skills

Abilities) for a position she was applying for. Subsequently, Frank Krider and Dorrance Andrews emailed Ms. Roberts second-line supervisor, Wayne Stogner to complain about Ms. Roberts visiting the Western Team Office. Mr. Stogner replied that when Ms. Roberts was off duty, he had no authority to tell her she could not go to the Western Team Section.

86.    Because Ms. Roberts was on a temporary duty assignment to the Streamline Center, her payroll was still processed through the Clerk's Office. Ms. Karen Cyrus, the person in charge of the Clerk's Office payroll, had previously attempted to send Ms. Roberts' "T&A" report (time and attendance report - payroll paperwork that should be reviewed and signed by an employee before a paycheck is issued) to the Streamline Office through inter-office mail.

87.    That inter-office mailing practice was discontinued soon after Ms. Roberts' T&A report envelope had been left on her desk and was opened by another Clerks' Office employee, Bernadine Hodges.

88.    To protect the confidentiality of Ms. Roberts' T&A report, which contained sensitive personal information including her social security number, Ms. Karen Cyrus agreed that Ms. Roberts should come to the Clerk's Office to review and sign her T&A report.

89.    On November 29, 2004, Ms. Roberts called Ms. Karen Cyrus in the Clerk's Office to find out if her T&A report was ready. Ms, Cyrus informed Ms. Roberts that Ms. Roberts supervisor, Glenda Evans had told Ms. Cyrus not to call Ms. Roberts or have her come to the Clerk's Office to sign her T&A report anymore. Instead, Ms. Roberts' T&A report was to be sent through inter-office mail again.

90.   Sending Ms. Roberts T&A reports through inter-office mail not only exposed Ms. Roberts T&A reports to the risk of it being opened again by a fellow employee, inter-office mailing also delayed the timely and accurate processing of Ms. Roberts paycheck because Ms. Roberts had to wait until the inter-office mail was received, review it, sign it and send it back to Ms. Cyrus.  Furthermore, while her T&A reports were routed through interoffice mail, if there was a mistake in her T&A report, that mistake could not be corrected before paychecks were issued.

91.   On information and belief, Ms. Evans' order preventing Ms. Roberts from going to the Western Team Office to inspect and sign her T&A report was the result of requests made by Ms. Karen Vowell and through Mr. Frank Krider, which requests was harassment and hostile acts undertaken in reprisal for Ms. Roberts' naming Ms. Vowell and Frank Krider as responsible management officials ("RMOs") in her informal EEOC complaint of race discrimination.

92.   On November 30, 2004, Ms. Roberts filed an amendment to her EEOC complaint in which she alleged the above-described acts were acts taken in reprisal for her prior EEOC activity and which created a hostile work environment.  On information and belief, her supervisors were notified of this amendment soon thereafter.

93.   On December 9, 2004, Ms. Roberts received a mid-term evaluation from her supervisor, Ms. Glenda Evans.  Although Ms. Roberts job performance continued to be outstanding, as it had been during the 2003/2004 performance evaluation period, Ms. Evans lowered Ms. Roberts' performance rating from "Outstanding" to "satisfactory." On information and belief, the decision to lower Ms. Roberts' performance rating from "outstanding" to

"satisfactory" was undertaken in retaliation for her complaint to the EEOC of race discrimination.

94.    On December 20, 2004, Ms. Roberts emailed Karen Vowell to inquire about a missing motion.  The email read: "Karen by chance do you still have the motion for case # [. . .] at your desk, if so please send it to me."  Ms. Vowell responded by e-mail: "Due to the horrible charges you filed against me, I prefer you to go through your supervisor."  In so doing, Ms. Vowell refused a reasonable work-related request for the sole reason that Ms. Roberts had filed an EEOC complaint.  This refusal made it more difficult for Ms. Roberts to complete her work in a timely manner.  Although Frank Krider was immediately informed of Ms. Vowell's blatant retaliatory conduct, he took no action against Ms. Vowell

95.    On December 27, 2004, Ms. Robert's detail in the Streamline Section had ended and she was transferred back to the Clerk's Office.  Management could not place Ms. Roberts back under the supervision of Karen Vowell on the Western team; and because of Ms. Roberts' "reputation," created by Ms. Vowell, no other Clerk's Office team supervisor wanted Ms. Roberts assigned to their team.  Accordingly, Ms. Roberts was placed under the supervision of Deputy Chief Marcia Cato and she was temporarily assigned to process FOIA requests submitted to the BIA.

96.    On or about January 25, 2005, The EEOC accepted and investigated Ms. Roberts' first amendment to her original complaint.

97.    On February 3, 2005, Ms. Roberts was permanently assigned to the Clerk's Office, Priority Case Management Team.  Under the supervision of  new supervisors, Dorrance

Andrews (first-line supervisor) and Steve Gundersen (second-line supervisor). Ms. Andrews and Mr. Gunderson had not wanted Ms. Roberts to be assigned to their team because of her "reputation" and because of her EEOC complaint. They were unhappy to have Ms. Roberts "foisted" upon them.

98.     At a meeting on that day, Ms. Andrews and Mr. Gunderson told Ms. Roberts that she was no longer allowed to visit the Western Team section and socialize with her friends and former co-workers.

99.     On information and belief, no other BIA, Clerks' Office employee has ever been given a similar instruction. In fact, many BIA Clerks' Office employees regularly visited the Western Team section to socialize with friends and co-workers there.

100.    According to Beverly Shears, Ms. Vowell does not object when any other BIA employees visit the western team section to socialize with western team employees.

101.    On information and belief, the aforesaid instruction was given at the request of Karen Vowell, which request was an act of reprisal in response to Ms. Roberts complaint to the EEOC of race discrimination. This was yet another act of harassment , and an act contributing to the hostile work environment.

103.    On information and belief, the aforesaid instruction was approved by Frank Krider, which approval was an act of reprisal in response to Ms. Roberts' complaint to the EEOC of race discrimination. This approval was yet another act of harassment and contributed to the hostile work environment.

104.    As part of new her duties in the Priority Case Management Department, Ms. Roberts had to scan 16 cabinets per day. These were the double cabinets in the file room, called

"times two" cabinets, which contained 12-14 shelves holding 200-500 case files in each cabinet.

105.    There were only two scanning stations in the filing room, one assigned to each of two section of the filing room.  The entire Clerk's Office used these two scanners.  Often, other Clerk's office employees were using these scanners and Ms. Roberts had to wait her turn to begin her scanning tasks.  Ms. Roberts was not given authority to order Clerk's Office contractors or employees to surrender the scanners for her use.

106.    On the morning of March 15, 2005, a Clerk's office contractor was already using the scanner for the file section Ms. Roberts was assigned to scan.  Ms. Roberts made an agreement with the contractor, that when the contractor was finished, he would immediately notify Ms. Roberts that she could begin her scanning tasks.

Ms. Roberts then returned to her desk to send an email to her supervisor when her supervisor came to Ms. Roberts desk, pointed a finger in her face and in a raised voice demanded that she stop writing emails and begin scanning case files immediately.  Ms. Roberts explained that she had to wait until the contractor was finished and the contractor would tell her when he was done.  Ms. Andrews then went to the file room and made the contractor surrender the scanner so that Ms. Roberts could use the scanner.  Although Ms. Andrews may have misunderstood that Ms. Roberts had to wait in that moment for a scanner, her conduct - pointing a finger in Ms. Roberts face and raising her voice - was inappropriate under the circumstances, offensive and hostile.  Such managerial conduct was harassment and exacerbated the already hostile work environment.

107.   On March 15 and 16, 2005, Ms. Roberts arrived at her workstation to find copies of emails taped to her computer screen.  These e-mails from her supervisor, Dorrance Andrews, contained highlighted instructions regarding task to be completed on those days.  These e-mails had already been sent electronically and no other BIA Clerks' Office, so the step of publicly posting them on Ms. Roberts computer screen was unnecessary.  No other employees ever had emails taped to their computer screens.  This act was harassment and deliberately intended to embarrass Ms. Roberts.  As such it was a hostile act undertaken because of Ms. Roberts EEOC complaint..

108.   On March 15, 2005, Ms. Roberts filed an amendment to her EEOC complaint in which she alleged the above-described acts were harassing acts taken in reprisal for her prior EEOC activity and which created a hostile work environment.  On information and belief, her supervisors were notified of this amendment soon thereafter.

109.   On March 17, 2005, Dorrance Andrews sent a series of hostile e-mails to Ms. Roberts in which he berated her for performing a mandatory computer security test before scanning case documents.  This security test was mandatory for all BIA employees; it tested an employees' knowledge of DOJ security regulations and it had to be completed that day.  Ms. Roberts chose to take the test before scanning case files, so that she could take it while her mind was not fatigued.  There was plenty of time afterwards to complete the assigned scanning for that day.  These emails were unreasonable and were harassing and hostile acts undertaken because of Ms. Roberts EEOC complaint.  They added to the already hostile work environment

110.    On June 2, 2005, Donna Carr sent Ms. Roberts to the file room to scan a file.  When Ms.

Roberts arrived, she found that the scanner assigned to that section of the file room was

unavailable as it was logged on to another user, a contractor named Vasselina Bailey.

Ms. Roberts asked Ms Bailey to log off so that she could log on and begin scanning.  Ms.

Bailey refused; she said that Ms. Roberts should shut down and restart the computer

instead of bothering her to log off.  Ms. Roberts explained that the restart procedure

would waste 20 minutes and she again asked Ms. Bailey to log off.  Ms. Bailey refused

again.  At that same time, Ms. Bailey was moving a cart full of files and almost ran into

Ms. Roberts.  Instead of apologizing, Ms. Bailey said Ms. Roberts had, "better move out

of the way."  An argument between the two ensued.  A moment later, a supervisor,

Wanda Jones entered the file room.  Ms. Bailey said to Ms. Jones: "Somebody needs to

talk to Barbara before I have to fuck her up in here."  Ms. Jones told Ms. Bailey to go to

lunch, Ms. Jones went to lunch, Ms. Roberts re-booted the computer and scanned the file.

Wanda Jones wrote up a report about the incident in which she noted only that both Ms.

Roberts and Ms. Bailey were yelling and foul language was used.  She did not note Ms.

Bailey's threat of violence.

111.    Despite the fact that Ms. Bailey had had other alterations with other employees in the file

room and was known to dislike Ms. Roberts who had been appointed Supervisor of the

transcription unit over her in 2002, on July 7, 2005, Donna Carr published a letter of

proposed suspension proposing to suspend Ms. Roberts for the altercation with Ms.

Bailey.  Ms. Bailey was released back to her contractor employer without sanction.

112.    On or around August 17 of 2005, Ms. Roberts was suspended for one week because of

the altercation.  The conduct of her supervisors in investigating and acting to suspend Ms.

Roberts, and failing to address Ms. Bailey's threat, was and act of harassment in

retaliation for her EEO complaint.

113.     In September of 2005, Ms. Dorrance Andrews was replaced by John Seilers the

supervisor of the Priority Case Management Department and became Ms. Roberts first-

line supervisor.  Coincidentally, Mr. Seilers' opinion regarding Ms. Roberts' job

performance was dramatically different than Ms. Andrews' opinion.  He considered Ms.

Roberts' work to be excellent and he credited her efforts as being integral to allowing the

Clerk's office Eastern and Western Teams to "keep up with their briefing schedule

requirements."

114.    In December 2005, Ms. Roberts was given a temporary detail assignment to the Office of

the General Counsel (OGC).  For the period of January 2006, to March 2006, her OGC

supervisor, Crystal Souza, described Ms. Roberts as "very productive, exhibits great

enthusiasm, is very eager to learn, and completes her duties as assigned."

115.    Although Ms. Roberts was on a temporary detail to OGC, Mr. Seiler was still Ms.

Roberts supervisor of record and was responsible for issuing her performance appraisal.

On April 17, 2006, Mr. Seiler issued Ms. Roberts 2005/2006 performance appraisal in

which he rated her "outstanding" in each rating category and "outstanding" overall.  This

evaluation was based on Ms. Roberts' work in the Priority Case Management Department

and her first three months on the OGC detail as reported by Crystal Sousa.  Mr Seiler also

recommended Ms. Roberts for a QSI award – a step increase in her pay.

116.     By earning an "outstanding" overall rating on her performance evaluation, Ms. Roberts

was entitled to receive the recommended QSI award as long as there was money in that

years Clerk's Office budget to award QSIs to employees.

117.    On information and belief, there was money in that year's Clerk's Office budget to award

QSI's to employees, yet Donna Carr denied Ms. Roberts the QSI without cause.  This

was yet another act of reprisal because of Ms. Roberts' prior EEO activity.

118.    Had Ms. Roberts received this QSI award, she would have received, *inter alia*, a $250

one-time bonus, an extra week off with pay and a step-increase in her pay scale worth

$1,500 a year.

119.    Ms. Roberts job performance for her remaining time on the OGC detail assignment (until

September 19, 2006) was described as "outstanding" and/or "excellent" in every category

in her interim evaluation, which was issued by Crystal Souza on January 25, 2007.

120.    The OGC actually wanted Ms. Roberts to remain there and requested the Clerk's Office

to relinquish her slot to OGC.  The Clerk's Office refused, citing a pre-existing shortage

of personnel.

121.    On September 26, 2006, Ms Roberts was moved back to the Clerk's Office and assigned

to the Program Staff, under the supervision of April Verner.  She was assigned to work

with Sue Gerhart, GS-12, the only Program Staff person assigned to process Federal

Court Remand filings for all fifty states.  Ms. Gerhart had been in that position for five

years but was never able to overcome a severe filings backlog.

122.    On information and belief, Ms. Gerhart felt overworked in her position, as the job was

too much for any one individual to perform alone.

123.    Although Ms. Gerhart was a GS-12 who was having trouble meeting the demands of that

position, the clerk's office (presumably at the direction of then Deputy Chief Donna

Carr), decided to transfer Ms. Gerhart's Federal Court Remand duties to Ms. Roberts, a

GS-7.

124. On information and belief, Ms. Carr decided to put Ms. Roberts in this position because it

was a position that a GS-12 was not able to handle by herself and because she expected

that Ms. Roberts, a GS-7 would also be unable to handle the position by herself.  Ms.

Carr and Clerk's Office management intended Ms. Roberts to fail in this job, which

would provide the Clerk's Office with a pretext for terminating Ms. Roberts'

employment.

125. Curiously, in the interim period while Ms. Roberts was trained for the position, the

federal court remand duties were taken from Ms. Gerhart and assigned to not one, but

three BIA employees.

126. Ms. Roberts completed her training for Federal Court Remand duties on January 12,

2007.

127. Two days after she officially took over Federal Court remand processing duties, Ms.

Roberts' new supervisor, April Verner, started writing Ms. Roberts up for purported

mistakes and purported unprofessional conduct in meetings; and these write ups formed

the basis for an "unsatisfactory" annual performance evaluation he issued to Ms. Roberts

on October 17, 2006, a Letter of Proposed Suspension he issued to Ms. Roberts on March

8, 2007, denial of her bi-annual "within grade" pay increase on June 26, 2007 and an

Order of suspension issued by Donna Carr on June 26, 2007.

128.	The Letter of Proposed suspension charged Ms. Roberts cited 10 "specifications" of

purported failures to follow instructions and incidents of unprofessional conduct in

meetings.  Purported failures to follow instructions included, *inter alia*: (i) not

completing daily assignments which were verbally assigned only after she had already

been issued written assignments to do more work in a day than was possible for *any*

Clerk's office employee to complete in a day; (ii) not following the instructions of one

supervisor after another supervisor had given her conflicting and superceding

instructions, (iii) not processing files after her supervisors had removed them from her

desk without "scanning" the files to a new location and without informing Ms. Roberts

that she had taken the files; (iv) failing to send out notices, log in, assign and scan said

notices for further processing –  Ms. Verner did not understand that said notices could not

be scanned for further processing until two weeks after they had been sent out because

SOP required that a party's representative have two weeks to respond to said notices

*before* they could be "scanned" for further processing; (v) failing to inform an *acting*

team leader that she would need to take time off on the following Monday– she had

followed her actual team leader's specific instructions to put her leave slips in the team

leader's in-box  when the team leader was not in the office.

129.	The incidents cited as "unprofessional" conduct in meetings were actually incidents

where Ms. Roberts was asked to explain her failures to complete tasks in meetings with

her supervisors.  Several times Ms. Roberts tried to explain to her supervisors that

problems with computer software had prevented her from completing assignments on

time because they caused data errors in reports that she had to constantly correct.  Her

managers cut her off when she spoke about such errors and they told her they did not want to hear about any computer problems. When they continued to ask for other reasons for her failures, Ms. Roberts said that she had nothing else to say. Ms. Roberts' failures to provide alternative reasons for not completing tasks on time constituted the conduct Ms. Verner characterized as "unprofessional."

130.    Despite Ms. Roberts and her attorney's response to the proposed suspension, which response provided evidence that most factual predicates for the "specifications" charged were false, Donna Carr approved the suspension and on June 26, 2007, Ms. Roberts was suspended for one week.

131.    Also on June 26, 2007, Ms. Carr denied Ms. Roberts another pay increase, a "within grade" bi-annual wage increase. The denial was based upon the same erroneous "specifications" of poor performance and misconduct.

132.    The incidents comprising the "specifications" justifying suspension, the "unsatisfactory performance evaluation, the suspension itself and the denial of the "within grade" bi-annual wage increase were all incidents of reprisal undertaken because of Ms. McGhee's prior EEO activity. These incidents constitued harassment and contributed to and exacerbated the already hostile work environment in the Clerk's Office.


## V.  CLAIMS FOR RELIEF

### Count 1.

### Race Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.

133.    Plaintiff re-alleges and incorporates by reference paragraphs numbered 1-132 above.

134. Plaintiff is an employee within the meaning of Title VII and belongs to classes protected under the statute, namely race (African-American) and color (black).  See 42 U.S.C. § 2000e(f).

135.  Defendant is an employer within the meaning of Title VII. 42 U.S.C. § 2000e(b)

136. Defendant intentionally discriminated against Plaintiff because of her race and color, in violation of 42 U.S.C. § 2000e, et seq., when on or about February 23, 2004, her former first-line supervisor, Defendant Karen M. Vowell, a Supervisory Program Specialist made false, malicious and disfavoring remarks to Plaintiff's then present first-line and second-line supervisors, Glenda Evans and W. Wayne Stogner, concerning Plaintiff's character, attitude and work performance.

137. Relying upon Ms. Vowell's false remarks, Glenda Evans decided that Ms. Roberts performance evaluation should be downgraded from 'outstanding" to "fully satisfactory" in the rating category of "Communications/Teamwork." Ms. Roberts performance evaluation graded her as 'outstanding" in all other rating categories.  Had she not been downgraded in the rating category of "Communications/Teamwork," Ms. Roberts would have also been rated "outstanding overall."

138. On August 12, 2004, Ms. Vowell admitted to Andrew Press (EEO), Crystal Riley (EEO) and Mr. Wayne Stogner that she blamed Ms. Roberts for these incidents without cause and had done so for an impermissible purpose - to protect her friend who was really to blame.  Despite Ms. Vowell's admission, Ms. Roberts' 2003/2004 performance evaluation was never corrected.

139. As a result of this downgrade, Ms. Roberts was not eligible for a QSI one-time bonus

award or a step increase in her pay, she was not awarded extra days off that she would have been awarded if rated "outstanding overall." Additionally, her potential for advancement within the Agency, her professional marketability within other federal agencies and her professional marketability in the private sector were all harmed by this less than "outstanding overall," rating.

140.   Had Ms. Roberts been a Caucasian person, Ms. Vowell would not have felt entitled and empowered to make false and malicious statements about Ms. Roberts.

141.   Had Ms. Roberts been a Caucasian person, Glenda Evans would not have downgraded Ms. Roberts performance evaluation based solely on Ms. Vowell's disfavoring and false remarks without first conducting an appropriate investigation to confirm said remarks were true. She conducted no such investigation.

142.   Had Ms. Roberts been a Caucasian person, Glenda Evans would have revised and corrected Ms. Roberts' 2003/2004 performance appraisal after discovering that Ms. Vowell's remarks, the remarks she had relied on, were false. Because Ms. Roberts is black, Ms. Evans did not bother to do so.

143.   Had Ms. Roberts been a Caucasian person, Chief of the Clerk's office, Frank Krider would have taken steps to investigate Ms. Roberts numerous complaints regarding the treatment she'd received from Ms. Vowell. Because Ms. Roberts was black, Frank Krider did not bother to do so.

144.   Had Ms. Roberts been a Caucasian person, upon discovered that Ms. Vowell had lied, the then Chief of the Clerk's Office, Frank Krider would have disciplined Ms. Vowell for so abusing her authority and he would have ordered Ms. Evans to revise and correct Ms.

Roberts 2003/2004 performance appraisal.  Because Ms. Roberts was black, he did not

bother to do so.

145.    Accordingly, Ms. Roberts was discriminated against with respect to her compensation,

terms, conditions or privileges of employment because of her race and color.

### Count 2.

**Reprisal, Harassment and Hostile work Environment Discrimination
in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq**.

146.    Plaintiff re-alleges and incorporates by reference paragraphs numbered 1-145 above.

147.    Ms. Roberts filed a formal EEO complaint on August 19, 2004.  This was a protected

EEO activity within the scope of 42 U.S.C. § 2000e-3(a).

148.    Subsequent to and in hostile response to Ms. Roberts protected EEO activity, at the

request of Ms. Vowell, Ms. Roberts was prevented by her supervisors from visiting the

Western Team Office to inspect and sign her T&A report.  This made it more difficult for

her to timely inspect her T&A reports to correct mistakes, delayed her signing her T&A

reports and thus delayed the processing of her paychecks.

149.    Subsequent to and in hostile response to Ms. Roberts' prior EEO activity, Ms. Roberts

mid-term performance evaluation was downgraded from "outstanding" to "satisfactory."

Although this downgrade was "unofficial," this unfair treatment, harassment and

contributed to a hostile work environment.

150.    Subsequent to and in hostile response to Ms. Roberts' prior EEO activity, Ms. Vowell

refused to cooperate with Ms. Roberts by not sending her motions documents Ms.

Roberts needed to complete her work.  Ms. Vowell admitted she did so in reprisal ("Due

to the horrible charges you filed against me") for Ms. Roberts filing a discrimination

claim with the EEOC.  Ms. Vowell's conduct towards Ms. Roberts added to the hostile work environment.

151.    Subsequent to and in hostile response to Ms. Roberts' prior EEO activity, at the request of Ms. Vowell, Ms. Roberts was ordered not to go to the Western Team Office to socialize with her friends and former co-workers.  Other employees were regularly allowed to do so.  This unfair treatment was harassment and added to the hostile work environment.

152.    Subsequent to and in hostile response to Ms. Roberts prior EEO activity, Ms. Karen Vowell, Ms. Glenda Evans, Mr. Steve Gunderson, Mr. Dorrance Andrews, and Mr. Frank Krider, Ms. Donna Carr and other BIA, Clerk's Office managers harassed and/or acquiesced in allowing the harassment of Ms. Roberts.  This campaign of harassment added to the hostile work environment.

153.    Subsequent to and in hostile response to Ms. Roberts prior EEO activity, Ms. Roberts was put into a job for which she was not qualified, her performance in that position was sabotaged by her supervisors and her failures to perform in that position were used as a pretext to impose a one-week suspension.  This unfair treatment was harassment and added to the hostile work environment.

154.    Accordingly, Ms. Roberts was harassed and subjected to a hostile work environment and discriminated against with respect to her compensation, terms, conditions or privileges of employment reprisal/retaliation for her EEO activity protesting such discrimination.


## VI.  REQUESTS FOR RELIEF

Wherefore, Plaintiff requests the following relief be granted for the Counts above:

155. Corrective or preventive actions taken to eradicate the source of the identified discrimination and minimize the chance of its recurrence;

156. Placement in the position, or in a substantially equivalent position, the Plaintiff would have occupied if the discrimination had not occurred;

157. Back pay, lost benefits and awards, reimbursement of comp time expended in recovering from exposure to the hostile work environment;

158. Recovery of reasonable attorney's fees, costs and all expenses incurred in pursuing her Title VII claims;

159. Compensatory damages for losses including, but not limited to losses due to: emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and injuries to her professional, mental health, physical health and well being;

160. A transfer to a position outside of the Clerk's Office, which transfer preserves for her all seniority, pay increases and benefits she would have received had the above described acts of discrimination not occurred;

161. Appropriate disciplinary measures imposed on all US, DOJ, EIOR, BIA management officials who participated in discriminatory activities undertaken against Plaintiff; and

162. All other relief that law and equity may provide.


## VII.  JURY DEMAND

164. Plaintiff requests a trial by jury for all issues so triable.

Respectfully Submitted:

__/s/_____

F. Douglas Hartnett
DC Bar 466851
Elitok & Hartnett at Law, L.L.C.
2428 Wisconsin Avenue, NW
Washington, DC 20007
(202) 965-0529 (vox)
(202) 965 0530 (fax)
*Counsel for Plaintiff*

| **I (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| **(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF<br>**(EXCEPT IN U.S. PLAINTIFF CASES)** | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT<br>**(IN U.S. PLAINTIFF CASES ONLY)**<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| **(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |

**II.  BASIS OF JURISDICTION**

(PLACE AN x IN ONE BOX ONLY)

- 1  U.S. Government
  Plaintiff
- 2 U.S. Government
  Defendant
- 3  Federal Question
  (U.S. Government Not a Party)
- 4  Diversity
  (Indicate Citizenship of
  Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | 1 | 1 | Incorporated or Principal Place<br>of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place<br>of Business in Another State | 5 | 5 |
| Citizen or Subject of a<br>Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT

**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

| **A.** *Antitrust* | **B.** *Personal Injury/ Malpractice* | **C.** *Administrative Agency Review* | **D.** *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| 410 Antitrust | 310 Airplane<br>315 Airplane Product Liability<br>320 Assault, Libel & Slander<br>330 Federal Employers Liability<br>340 Marine<br>345 Marine Product Liability<br>350 Motor Vehicle<br>355 Motor Vehicle Product Liability<br>360 Other Personal Injury<br>362 Medical Malpractice<br>365 Product Liability<br>368 Asbestos Product Liability | 151 Medicare Act<br><br>**Social Security:**<br>861 HIA ((1395ff)<br>862 Black Lung (923)<br>863 DIWC/DIWW (405(g)<br>864 SSID Title XVI<br>865 RSI (405(g)<br>**Other Statutes**<br>891 Agricultural Acts<br>892 Economic Stabilization Act<br>893 Environmental Matters<br>894 Energy Allocation Act<br>890 Other Statutory Actions (If<br>Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| **E.** *General Civil (Other)* | **OR** | **F.** *Pro Se General Civil* | |
|---|---|---|---|
| **Real Property**<br>210 Land Condemnation<br>220 Foreclosure<br>230 Rent, Lease & Ejectment<br>240 Torts to Land<br>245 Tort Product Liability<br>290 All Other Real Property<br><br>**Personal Property**<br>370 Other Fraud<br>371 Truth in Lending<br>380 Other Personal Property Damage<br>385 Property Damage Product Liability | **Bankruptcy**<br>422 Appeal 28 USC 158<br>423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>535 Death Penalty<br>540 Mandamus & Other<br>550 Civil Rights<br>555 Prison Condition<br><br>**Property Rights**<br>820 Copyrights<br>830 Patent<br>840 Trademark<br><br>**Federal Tax Suits**<br>870 Taxes (US plaintiff or<br>defendant<br>871 IRS-Third Party 26<br>USC  7609 | **Forfeiture/Penalty**<br>610 Agriculture<br>620 Other Food &Drug<br>625 Drug Related Seizure<br>of Property 21 USC 881<br>630 Liquor Laws<br>640 RR & Truck<br>650 Airline Regs<br>660 Occupational<br>Safety/Health<br>690 Other<br><br><br>**Other Statutes**<br>400 State Reapportionment<br>430 Banks & Banking<br>450 Commerce/ICC<br>Rates/etc.<br>460 Deportation | 470 Racketeer Influenced &<br>Corrupt Organizations<br>480 Consumer Credit<br>490 Cable/Satellite TV<br>810 Selective Service<br>850 Securities/Commodities/<br>Exchange<br>875 Customer Challenge 12 USC<br>3410<br>900 Appeal of fee determination<br>under equal access to Justice<br>950 Constitutionality of State<br>Statutes<br>890 Other Statutory Actions (if<br>not administrative agency<br>review or Privacy Act |

| **G.** *Habeas Corpus/ 2255* | **H.** *Employment Discrimination* | **I.** *FOIA/PRIVACY ACT* | **J.** *Student Loan* |
|---|---|---|---|
| 530 Habeas Corpus-General<br>510 Motion/Vacate Sentence | 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | 895 Freedom of Information Act<br>890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | 152 Recovery of Defaulted Student Loans (excluding veterans) |

| **K.** *Labor/ERISA (non-employment)* | **L.** *Other Civil Rights (non-employment)* | **M.** *Contract* | **N.** *Three-Judge Court* |
|---|---|---|---|
| 710 Fair Labor Standards Act<br>720 Labor/Mgmt. Relations<br>730 Labor/Mgmt. Reporting & Disclosure Act<br>740 Labor Railway Act<br>790 Other Labor Litigation<br>791 Empl. Ret. Inc. Security Act | 441 Voting (if not Voting Rights Act)<br>443 Housing/Accommodations<br>444 Welfare<br>440 Other Civil Rights<br>445 American w/Disabilities-Employment<br>446 Americans w/Disabilities-Other | 110 Insurance<br>120 Marine<br>130 Miller Act<br>140 Negotiable Instrument<br>150 Recovery of Overpayment & Enforcement of Judgment<br>153 Recovery of Overpayment of Veteran's Benefits<br>160 Stockholder's Suits<br>190 Other Contracts<br>195 Contract Product Liability<br>196 Franchise | 441 Civil Rights-Voting (if Voting Rights Act) |

## V. ORIGIN

| 1 Original Proceeding | 2 Removed from State Court | 3 Remanded from Appellate Court | 4 Reinstated or Reopened | 5 Transferred from another district (specify) | 6 Multi district Litigation | 7 Appeal to District Judge from Mag. Judge |
|---|---|---|---|---|---|---|

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

| VII. REQUESTED IN COMPLAINT | CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23 | **DEMAND $**<br>**JURY DEMAND:** | Check YES only if demanded in complaint<br>**YES       NO** |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | (See instruction)   **YES**   **NO** | If yes, please complete related case form. |
|---|---|---|

**DATE**          **SIGNATURE OF ATTORNEY OF RECORD**

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

    **I.** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

    **III.** CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section **II**.

    **IV.** CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

    **VI.** CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

    **VIII.** RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.